There certainly is no evidence to warrant the conclusion that the plaintiff has converted it to his use; or that his omission to assign it, has deprived the defendants of any benefit or advantage they might have derived from it. The Court are of opinion, therefore, that the plaintiff is not chargable with the judgment, as claimed by the appellant; that if any thing has been done to embarrass its future collection, it was by no fault of the plaintiff, and that he can not be held responsible on that account; and, finally, that full and complete justice can be done between the parties, by so re-forming the judgment of the Court below, as to require the plaintiff to make the proper assignment of the judgment in question; and that the judgment under revision be, in other respects affirmed.

Judgment re-formed.

## HANCOCK v. HORTON.

The case of Hancock v. McKinney, (7 Tex. R. 384,) cited and confirmed.

Appeal from Travis. The facts were subtantially the same as in the case of Hancock v. McKinney, reported in 7th Texas Reports; and both cases were submitted together. The briefs of Mr. Webb and Mr. Duval were not found by the Reporter, when he prepared the report in the former case. They are considered necessary, to a full report of the decision upon the important questions involved, and are therefore inserted here, although the Court did not re-discuss those questions.

*J. Hancock* and *J. Sayles*, for appellant. (See Hancock v. McKinney, 7 Tex. R. 384.)

*J. Webb*, for appellee. It is not contended that there was any Commissioner, or that the lands were embraced in any colonial enterprise. The title, therefore, had to be extended by an Alcalde; and the question is, Which was the proper Alcalde to extend it? The term municipality, here, does not exactly mean a tract of country, bounded by territorial limits, or lines distinctly defined. It more properly means a tract of country, upon which there is a population residing, and over which certain municipal authorities exercise jurisdiction and control. This may be inferred from decree 12, p. 11; decree 27, p. 44; decree 32, p. 56; and Articles 47, 48, 49, 155, 156, 157 and 164 of the Constitution; and indeed all other laws and decrees, which speak of municipalities, municipal jurisdictions and Ayuntamientos. It is true, that there is nothing direct and conclusive on the subject, in these decrees and Articles of the Constitution; but, in the absence of all laws, showing that the term municipality was to be applied to territory, without reference to population, these decrees and Articles, showing the application of the term to population, without reference to territory, are, at least, persuasive that such is the construction of the term. If boundaries and territorial limits are essential to municipalities, there was no municipality of either Austin or Bexar; because the limits of neither were ever defined; and yet they both had an Ayuntamiento, which was the municipal government.

Bexar was at first a department. Its limits, as such, were defined, being the limits of Texas. That department afterwards was carved into two districts—the district of Nacogdoches and the district of Bexar; and its limits, as a district, were also defined. (Decree 164, p. 171.) The general term, however, of department of Bexar, was still retained, as applicable to the whole country, though its authorities ceased to exercise jurisdiction over one-half of it. As a municipality, Bexar never had any defined limits.

It is admitted that the term municipality embraces territory, and the limits of it may be defined; but, if not defined, it

means, and can mean nothing else than that territory upon which a population lives, over which the Ayuntamiento of the place exercises control and jurisdiction. If this were not the case, and the term municipality applied to large extents of vacant territory, upon which there was no population, how shall we determine the limits of that territory as applied to the municipalities of Bexar, Austin, Goliad, and others, whose limits have never been defined ? Did all the vacant territory of the country belong to the municipality of Bexar, to that of Austin, or to that of Goliad ? And if so, to which of those municipalities did it belong ? And if not all of it, what part of the vacant territory was embraced in each ?

The impossibility of answering these questions is another persuasive argument that these municipalities, when not defined by actual bounds and limits, extended only over so much of the country as had a population upon it, to be controlled and governed by the municipal authorities, or Ayuntamientos.

Another argument in support of this view is found in the fact that these municipal authorities had no control over the public domain. They could not grant or dispose of it to any one, except by the express authority of the government, given in each particular case ; but they did have a general jurisdiction and authority over the population.

The testimony in this case is that all of Austin's colonies were considered as within the municipality of San Felipe, because the Ayuntamiento of that place exercised jurisdiction over the inhabitants living in those colonies, until the municipalities were formed, and separate governments given them. But it does not follow, that all the vacant lands within those colonies were within that municipal jurisdiction.

Thus the decree 196, p. 197, establishing the municipality of Brazoria, carves that municipality out of the southern portion of the municipality of Austin ; but the limits of that municipality do not extend to the south-western limits of Austin's colony. Now to what municipality did the small slip of country lying between the south-western limits of the munici-

pality of Brazoria and the south-western limits of Austin's colony belong? Could it have been the intention of the government to have placed persons, who might settle on that slip, within the jurisdiction of Austin, when, in going to the seat of that municipal jurisdiction, they would have to pass entirely through the municipality and jurisdiction of Brazoria? or is it not more probable, that that small slip would remain without the limits of any municipality, until one should be established to embrace it? and that, in the meantime, if necessary, it might be provided for under the 158th Article of the Constitution? The same may be said of decree 265, p. 242, creating the municipality of Matagorda, which was taken, mainly, from the municipality of Brazoria, but extended farther west, still however leaving a small slip between its south-western limits and the limits of Austin's colony.

Decree 283, p. 274, establishing the municipality of San Patricio and Mina, defines the San Patricio municipality as being in the department of Bexar, but not as being taken from the municipality of Bexar, and directs the Alcalde of Goliad to organize it. The municipality of Mina is formed principally of territory lying west of the Colorado river, and above the San Antonio road, and embraces the land in controversy; and yet the Alcalde of Austin is directed to preside over its municipal elections. If this territory was previously in the municipality of Bexar, why require the Alcalde of Austin to perform this duty? Bexar was much nearer to it than San Felipe.

If there was a doubt as to which municipality the land was in, would not that doubt go to support the grant? (6 Peters, 727, 728; 2 Peters, 217.) Does the evidence remove the doubt? So far as the testimony of the witnesses go, the evidence can hardly be said to preponderate on one side or the other. Sims speaks of his impressions, without any knowledge of the fact; and Burleson does the same; and their impressions are directly adverse to each other. Burleson, however, assigns the best reasons for his. Gen. Chambers evidently referred to

Bexar as a dpartment, and not to Bexar as a municipality; and the impressions of both, himself and Sims, doubtless grew out of their knowledge or understanding of the limits of Bexar as a department. The witnesses from San Antonio, who ought to have been better informed on the subject, than others, did not know anything of the limits of the municipality of Bexar, but believed that none had ever been designated. In addition to the parol testimony, we have the evidence resulting from the Acts of the Alcalde. It is not to be presumed that he wilfully violated his duty and the law, and assumed the exercise of jurisdiction, when he did not believe he possessed it. This would be reversing the entire rule of presumptions. The Alcalde of Austin, then, believed he had jurisdiction over the subject matter, and he was much more likely to know the fact, than either of the witnesses sworn at the trial; and his belief, combined with that of Burleson, gives a strong preponderance in the testimony, in favor of the fact that the land was in the jurisdiction of Austin. To say the least of it, it was a question of fact and about which there was discrepant testimony, and the jury, who were the judges of the fact, found it for the defendants.

If the land was not in any municipality, then there can be no question that it was nearer to the municipality of Austin, than to that of Bexar. The testimony shows that Austin's colonies were within the municipality of Austin; and the Court judicially knows that Austin's upper, or little colony, lay on the east side of the Colorado, a part of which was immediately opposite the land, and only separated from it by the river. The testimony also shows, that there was but one person living on the west side of the river, above the San Antonio road, and that individual, when called upon by a general call upon the inhabitants, to render service to the country, reported himself at San Felipe, thereby showing that he regarded himself as being within that jurisdiction, otherwise he would surely have gone to San Antonio, which was nearer to his place of residence.

*T. H. Du Val*, also, for appellee. I. For the appellee it is contended that the great and leading features of this case, are similar to those of the U. States v. Arredondo & Son, (6 Peters, 691,) and that the controlling questions, herein presented, have been already adjudicated by the highest tribunal known to our country. The analogy consists in this:

The grant to Del Valle, like that to Arredondo, was a full and perfect one. It conveyed the full property in fee, coupled with conditions subsequent. In the case of Arredondo & Son, the Spanish government made them an absolute grant in fee, of four leagues of land, they obligating themselves to establish thereon two hundred families, in three years at farthest; in default of which the said grant was to be null and void. In the case of Del Valle, a full and perfect grant in fee was likewise made to him, by the Governor of the State of Coahuila and Texas, in sale, for ten sitios of land, which grant, under the 24th Art. of the Colonization law of 1825, was "subject "to the condition that he should cultivate the same with-"in six years from the acquisition, under the penalty of for-"feiting the same."

It is clear, that in both these cases, the grantees had a full and absolute title in fee; but there was this important distinction, as regarded a non-compliance with the conditions on which the grants were made, i. e.: In Arredondo's case, on the face of the grant itself, it was to be "null and void;" whilst in Del Valle's case, he was only required to perform the condition annexed to his grant, "under penalty of forfeiting the same." This is an important difference. So far, therefore, as the conditions annexed to the two grants are concerned, the reasons for sustaining that to Del Valle, are much the strongest.

Another most striking and important distinction, between this case and that of Arredondo and other Florida cases, so far as conditions annexed to the grants are concerned, is this, that in the Florida cases, the government of the United States was a party to the suits. Here the suit is between individuals. The United States, on the acquisition of Florida, and by vir-

28

tue of the treaty, succeeded to all the rights of the Spanish government. As between the government, therefore, and the original grantees, or those claiming under them, the latter might well be required to show their compliance with the conditions annexed to their grants, which, as between individuals, could not be required. What right has an individual, either in law or justice, to call upon an innocent purchaser to prove that the original grantee, under whom he claims, had performed the conditions annexed to the grant, by cultivating the land, paying taxes, &c.? None whatever; for, it would be conferring on a private individual, a privilege belonging only to the government which made the grant, and which is alone interested in the matter.

II. The Florida grants which were declared void by the Supreme Court of the United States for non-compliance with the conditions, were in cases where the conditions were precedent, and the government itself a party. In the case of the U. States v. Mills' heirs, (12 Peters, 215,) and in Kingsley's case, (12 Peters, 476,) the grantees were to perform certain acts, and the very terms used in the concessions show that "until" those acts were performed, the said grants were to be considered null and void. The grant to Del Valle was not to be considered as void for a want of compliance with the conditions. This is neither expressed in the terms of the concession or grant, or in the law under which it was made. By the terms of the law, Del Valle was to cultivate the lands he acquired, within six years from the acquisition, "under the penalty of forfeiting the same." In such case, even if the government of Texas was a party to this suit, it could not be said that a forfeiture had accrued to her by virtue of the terms used in the law. The forfeiture would have to be ascertained and declared by judicial action. The only case in which a forfeiture can be declared to exist, without office found, or some analagous proceeding, is where the terms of the concession, or language of the law, are so strong and explicit as to forbid any other construction. Such was the case in the con-

fiscating Acts of Maryland in 1780, where, by the very terms of the law, it was declared that "all property within this " State, debts only excepted, belonging to British subjects, " shall be seized, and is hereby confiscated to the use of the " State." So in the case of Holliman v. 'Peebles, decided by this Court at December Term, 1847, (1 Tex. R. 673,) the law itself declared, that after abandoning the State, settlers should no longer hold their land, "and should they not have previous- " ly disposed of the same, or should not the alienation be in " conformity with Art. 27, it shall become entirely vacant;" or, as the Spanish words are rendered by this Court, "it shall remain entirely vacant." (1 Tex. R. 691, 692, 706.)

III. It is laid down in the Arredendo case, (p. 729,) that " the only questions which can arise, between an individual " claiming a right under the acts of a public officer, and the " public, or any one denying its validity, are power in the " officer, and fraud in the party." Most of the objections made by the appellant to Del Valle's title go to the one or the other of these.

There is no evidence of fraud on the part of Del Valle in obtaining the grant in question. He appears to have bought the land in good faith, from the proper authority.

Nor is there any evidence that proves a want of power in the officer who made the concession, or in the officer who extended the title to Del Valle—at least none sufficient to outweigh the presumption, universally indulged by the law, in favor of the legality of the acts of all public officers. In Polk's lessee v. Wendell et al., Ch. J. Marshall says that "the laws " for the sale of public lands provide many guards to secure " the regularity of grants, to protect the incipient rights of in- " dividuals, and also to protect the State from imposition. " Officers are appointed to superintend the business, and rules " are framed prescribing their duty. These rules are in gen- " eral directory; and when all the proceedings are completed " by a patent, issued by the authority of the State, a compli- " ance with these rules is pre-supposed. That every pre-

" requisite has been performed, is an inference properly de-
" ducible, and which every man has a right to draw, from the
" existence of the grant itself. It would therefore be extremely
" unreasonable to avoid a grant, in any Court, for irregulari-
" ties in the conduct of those who are appointed by the gov-
" ernment to supervise the progressive course of a title, from
" its commencement, to its consummation in a patent," &c.
(9 Cranch, 98.)

IV. But, even if the absolute want of power in the officer
making this grant had been proven, we contend that it could
not, even at the suit of the government, be thereby declared
void. At most it could be only voidable, because the land
embraced in the grant is now in the hands of innocent pur-
chasers. (1 Tenn. R. 211; 5 Wheaton, 293.)

In Spencer's heirs v. Grimball, (6 N. S. 355,) the Supreme
Court of Louisiana, in discussing, what is called in their juris-
prudence, the doctrine of absolute and relative nullities, lays
it down as a settled principle, "that if the party who is em-
" powered to set aside a contract, does not choose to do it, no
" other can." Here the contract with Del Valle was com-
plete. There was thing, consent, price paid, and possession
delivered. It has been nearly twenty years since the grant
was made. During all this time, neither the government of
Coahuila and Texas, or that of Texas alone, ever complained
of the grant, or demanded its rescission. No attempt has been
made by the party, who had the right to do so, to annul the
sale. With what propriety, then, can a third party seek to
have it avoided, more especially when the land, included in
the grant, is now in the hands of innocent purchasers without
notice? And how can he be permitted to avail himself of
such privilege, when every presumption arising out of the
facts of the case compels the belief that the party whose rights
he wishes to enforce, (to wit, the government of Texas) either
never can or will itself enforce it? So far, therefore, as Hor-
ton is concerned, the fact of fraud on the part of Del Valle,
non-compliance with the conditions of the grant, or want of

Hancock v. Horton.

authority in the officers issuing the same, cannot affect his rights, he being an innocent purchaser without notice.   Horton bought the land in controversy in 1841.   He knew that a title, apparently authentic, had been issued by the Mexican government to Del Valle prior to the Texas Revolution ; that it was an absolute title in fee ; that it bore all the marks of authenticity ; that no proceedings had ever been instituted by the government of Mexico, or that of Texas, to annul it.   He had every reason to believe that it was all right.   If there was anything wrong in the title under which he purchased, he was ignorant of it.   Under such circumstances, the government of Texas itself, much less a private individual, could not deprive him of his land, on the ground that the title to Del Valle was void.   (Fletcher v. Peck, 6 Cranch, 133.)

The 4th Section of the schedule to our State Constitution, is a high legal recognition, that no forfeiture could be declared as having accrued here, because it makes it the duty of the Legislature to provide a method for ascertaining what lands may have been forfeited or escheated to the Republic of Texas. This the Legislature has never done.

It is further contended for the appellee, that his title to the land in controversy is protected and secured by the operation of the treaty of Guadalupe Hidalgo, made and entered into between the United States of America and the Republic of Mexico, on the 2nd day of February, 1848.

WHEELER J.   The material questions presented by the record in this case, were considered in the case of Hancock v. McKinney, heretofore decided.   (7 Tex. R.)   Upon the principles determined in that case, the judgment is affirmed.

Judgment affirmed.